UNITED STATES DISTRICT COURT
MIDDLE DISTRICT LOUISIANA

**TERRICA WILLIAMS**                                            **CIVIL ACTION**

**VERSUS**                                                       **NO.  15-563-JJB-SCR**

**BATON ROUGE CITY**
**CONSTABLE'S OFFICE**

**PLAINTIFF'S MEMORANDUM IN OPPOSITION**
**TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

NOW INTO COURT, through undersigned counsel, comes Terrica Williams, who respectfully submits this Memorandum in Opposition to the Motion for Summary Judgment filed by Defendant, Baton Rouge City Constable's Office ("BRCCO"), in the matter captioned above. Because issues of material fact abound in this dispute, Defendant's Motion should be denied.

**I.  STATEMENT OF FACTS**

On or about January 3, 2009, Plaintiff, Terrica Williams began her employment as a deputy officer with Baton Rouge City Constable's Office (hereinafter "Defendant"). As a Deputy Officer, she was assigned to the jail facility.[1] At that time, Williams' supervisor was Sergeant Jose Sosa, the jail supervisor. In addition to Sosa, while serving as a Deputy Officer, Williams also served under Jail Supervisors Marc Tabor, Brian Firmin, and Robin Tate.[2] As a result of serving under these sergeants, Williams had the privilege of learning and performing each position in the jail.[3] Soon thereafter, under Sergeant Robin Tate, Williams was promoted to the corporal position in the jail facility.[4] While serving as Deputy Officer and as Corporal, Williams not only learned how to perform the various deputy positions within the jail, she learned how to perform the supervisor's position as well. She observed how her superiors

---

[1] *See* Exhibit A: Deposition of Terrica Williams, pg. 7.
[2] *Id.* at pg. 42-43.
[3] *Id.* at pg. 8-10, 43-44.
[4] *Id.* at pg. 45.

1

supervised her fellow deputies when delegating the various jail facility assignments and, when mistakes were made, how her supervisors meted out discipline.[5] No matter the discipline, the supervisors' decisions were upheld by their superiors.[6]

On or about August 2012, due to her outstanding performance as a Deputy, Williams applied for and was promoted to the position of Sergeant.[7] As a Sergeant, Williams became the jail supervisor.[8] She was defendant's first female jail supervisor. Williams' two supervisors were Lieutenant Wagner and Captain Lawton.[9] Like her male counterparts, Williams had supervisory responsibilities over Defendant's deputy officers that served in the jail. Not surprisingly, Williams attempted to carry out her duties as she observed and learned from her male supervisors.[10] However, Williams' supervisors -- Lieutenant Wagner and Captain Lawton -- did not support Williams in her efforts to fulfill her job duties and responsibilities.[11] Instead of honoring her decisions as the jail supervisor, Defendant's superior officers repeatedly questioned and overturned them.[12]

*Williams' Supervisors Repeatedly Undermined her Authority*

Deputy Corey Hatfield, one of Williams' direct reports, repeatedly violated Defendant's policy and procedural manual by wearing facial hair and repeatedly reporting late for work.[13] In an effort to maintain order within the jail and amongst the deputies, Williams attempted to utilize Defendant's progressive discipline policy to address Deputy Hatfield's policy violations. Despite the fact that Hatfield's violations were recurring and his pattern of disobedience towards

---

[5] Id. at pg. 43-44.
[6] Id. at pg. 14, 24.
[7] *Id.* at pg. 8, ¶11-13.
[8] *Id.* at pg. 43.
[9] *Id.* at pg. 12.
[10] *Id.* at pg. 12, 23.
[11] *Id.* at pg. 12.
[12] *Id.* at pg. 12, ¶¶18-21. "And a lot of times I would make decisions, and the deputies would go to the lieutenant and then they'd go to the captain, and my decision would be overturned."
[13] *Id.* at pg. 15-16.

Williams apparent, Lieutenant Wagner and Captain Lawton would constantly override and retract Williams' decisions, repeatedly suggesting her to "give him another chance."[14]

Williams also attempted to employ Defendant's progressive discipline policy with Deputy Derek Gaudin, another deputy under Williams' supervision. Gaudin openly and audaciously disobeyed Williams' instructions. Namely, after being instructed by Captain Lawton to assign each deputy a shift to monitor an inmate who was admitted at the hospital, Williams -- who herself did a shift -- assigned four-hour shifts to each of her reports, including Deputy Gaudin. However, Gaudin expressly refused his assignment saying, "I'm not going."[15] After Williams explained to him that the orders were that everyone must go, Gaudin responded, "Okay. Well, we'll see."[16] The next morning, when Williams proceeded to discipline Gaudin for not showing up for his assigned shift, Gaudin informed her that he had talked to Captain Lawton who told him he did not have to go to the hospital.[17]

Another example of Williams' attempts to discipline her deputies involved Carol Edwards. Deputy Edwards violated the Disciplinary Code by taking a jail key home without returning it. Though Williams attempted to counsel Deputy Edwards, Williams believed that a harsher discipline, such as a verbal warning, was appropriate. However, Williams' efforts to impose such discipline were never put into effect because Williams' superiors intervened in each instance.[18] After advising Lieutenant Wagner about Deputy Edwards' insubordination, Williams was told to "just leave [Edwards] alone."

In addition, Defendant failed or refused to allow Williams to try, test, or implement plans or strategies in her capacity as Sergeant. For example, when Corporal Rhea Davis became

---

[14] *Id.* at pg. 16-17.
[15] *Id.* at pg. 27.
[16] *Id.*
[17] *Id.* at pg. 28. *See* also pg. 31.
[18] *See* Exhibit A, note 1 *supra*, at pg. 33, 34.

3

pregnant under Williams' supervision, she requested to be placed on light duty.[19] When Corporal Davis was previously pregnant during Sergeant Brian Firmin's term, Firmin assigned her to work in the control room over the *entire* course of her pregnancy.[20] Familiar with this prior handling of a similar situation, Williams granted Corporal Davis' request and assigned her to work in the control room on light duty, as had previously been done by Firmin.[21] But instead of honoring her decision, Williams' directive was reversed.[22]

Finally, Williams attempted to assign Corporal Davis' department vehicle to Senior Deputy Phillips Syas while Davis was pregnant.[23] Williams was aware that Sergeant Brian Firmin faced a similar situation in the past and had assigned a car without any problem whatsoever.[24] Corporal Davis' vehicle was not being used. However, soon after Williams assigned Deputy Syas the vehicle, Williams was ordered to return the vehicle.[25] Williams protested to Chief Deputy Navarre, but to no avail. As a result, the vehicle sat unused.[26]

Williams complained about the treatment she received with regard to her leadership decisions versus those of her male predecessors of equal rank in identical situations.[27] As Williams testified, ". . . I would go to my supervisors and ask for help, and it was like nothing would be done."[28] Despite Williams' requests for assistance, Defendant never addressed the chronic, persistent undermining of her authority, nor did Defendant conduct an investigation into the conduct. Ultimately, the stress and anxiety that Defendant's administration imposed on Williams caused her to suffer high blood pressure and related issues, requiring medical treatment

---

[19] *Id.* at pg. 40.
[20] *Id.* at pg. 41.
[21] *Id.*
[22] *Id.*
[23] *Id.* at pg. 38-39.
[24] *Id.*
[25] *Id.*
[26] *Id.* at pg. 39-40.
[27] Exhibit B: Deposition of Ganiyu Jimoh, at pg. 30, 44, 46, 48.
[28] *See* Exhibit A, note 1 *supra,* at pg. 12.

and monitoring.[29]  Unable to endure her employment at the Constable's Office any longer, on or about November 2013 Williams resigned.  Williams was replaced by Sergeant Travis Brooks, a man, who is currently a jail supervisor in Defendant's administration.[30]

### III.    LAW AND ARGUMENT

#### A.    Summary Judgment is inappropriate in this matter

Summary judgment is *only* appropriate when no genuine issue of material fact exists and the mover is entitled to judgment as a matter of law.  Fed. R. Civ. P. Rule 56.  "There is no 'genuine issue' only when the record taken as a whole could not lead a rational trier of fact to find for the non-movant." *Giroir,* citing *Matsuchita Electric Industrial Co., Ltd. V. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).  Stated another way, the movant is entitled to summary judgment if, and only if, after construing the evidence *in the light most favorable to the nonmoving party* and *drawing all justifiable inferences in favor of the nonmoving party*, no genuine issues of material fact remain to be tried.  Fed.R.Civ.P. 56(c)

<u>*Title VII: Employment Discrimination*</u>

Pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), it is unlawful for an employer, public or private, to intentionally discharge any individual or otherwise to intentionally discriminate against any individual with respect to his or her terms, conditions, or privileges of employment because of the individual's race or gender.[31]  Therefore, as the Supreme Court has stated, the core factual inquiry in an employment discrimination case is "whether the defendant intentionally discriminated against the plaintiff."[32]  That is, "is the

---

[29] *Id.* at pg. 11.
[30] *See* Exhibit C: Deposition of Thomas Wagner, at pg. 22, 45. Consequently, on or about November 21, 2013, Williams filed a Charge of Discrimination with the Equal Employment Opportunity Commission, complaining of sex-based discrimination.  Williams received written notice of her "Right to Sue" on or about January 25, 2015.
[31] Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, et seq.
[32] *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).

5

employer . . . treating some people less favorably than others because of their race, color, religion, sex, or national origin."[33]

In *Aikens*, the Supreme Court recognized that "the question facing triers of fact in discrimination cases is both sensitive and difficult [as] . . . [t]here will never be 'eyewitness' testimony to the employer's mental processes." Consequently, in the absence of direct evidence of discrimination, the courts have utilized the *McDonnell Douglas* framework, which permits plaintiffs to prove discriminatory intent based on circumstantial evidence.[34]

### B. The record demonstrates Plaintiff's ability to establish a Prima Facie Case

In the present motion, Defendant only challenges Plaintiff's ability to establish the third element of her gender-based constructive discharge claim, i.e., whether she suffered an adverse employment action. As demonstrated by the applicable case law addressing the matter, however, Defendant's arguments are overly simplistic and therefore misguided. As the record demonstrates, Plaintiff received opposition from her very first day on the job as the Constable Office's first female Sergeant to serve as Jail Supervisor. In the end, given the extreme insubordination from the deputies she supervised that was tacitly and overtly authorized by her superior officers, Plaintiff was jail supervisor in name alone. Therefore, despite the fact that she suffered no demotion in the sense of being assigned a lower title and received her full pay, the conditions of her employment were rendered so untenable that she was effectively neutered and rendered obsolete while under Defendant's employ. While the Fifth Circuit courts have looked to the factors set forth in *Haley v. Alliance Compressor LLC* as guidance in assessing the reasonableness of an employee's belief that she was compelled to resign, it is clear that the list of

---

[33] *United States Postal Service Board of Governors, v. Louis H. Aikens*, 460 U.S. 711, 715 (1983) citing *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577 (1978) quoting *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335, n. 15 (1977).
[34] *McDonnell Douglas, Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668, *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 141, 120 S.Ct. 2097, 2108, 147 L.Ed.2d 105 (2000).

seven factors was not intended to be exhaustive.[35] Plaintiffs must demonstrate that the working conditions were "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign."[36] Therefore, it is important that the courts examine the facts that the plaintiff points to as her evidence of the severity of her suffering under the defendant's employ. To be sure, as in Ms. Williams' case, these same factual elements also demonstrate that the plaintiff indeed suffered a real and cognizable adverse employment action, given the nexus that will always exist between the employee's decisions and the plaintiff's resulting employment experience.

In the present matter, the record reveals that Williams suffered severe humiliation as a midlevel office tasked with overseeing the jail, yet receiving no support from her superior officers in doing so. Worse, as she testified and as Defendant admits, many of Williams' supervisory decisions and proposed disciplinary actions regarding noncompliant deputies under he charge were undermined and blatantly overturned—always without the courtesy of an explanation from her superiors. Because this type of professional insult became the norm, Williams was rendered incapable of performing the fundamental duties of her job. Under the rationale of the Court of Appeals' holding in cases such as *Thompson v. City of Waco, Texas*[37], Lt. Thomas Wagner and the chain of command at the Constable's Office essentially stripped Williams of the integral and material responsibilities of a sergeant charged with supervising the jail, such that she no longer functioned as a sergeant in the organization at all. To be sure, she was a sergeant in name alone. Thus, Ms. Williams did in fact suffer an adverse employment action, the severity and perniciousness of which establish the reasonableness of her belief that

---

[35] 391 F.3d 644 (5th Cir. 2004) Seven factors: (1) demotion, (2) reduction in salary, (3) reduction in job responsibilities, (4) reassignment to menial or degrading work, (5) reassignment to work under a younger supervisor, (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation, or (7) offers of early retirement or continued employment under less favorable terms.
[36] *See, e.g., Bourque v. Powell Electrical Mfg. Co.*, 617 F.2d 61, 65 (5th Cir. 1980)
[37] 764 F.3d 500 (5th Cir. 2014)

she had no choice but to resign.  To be sure, as she testified, Ms. Williams had been diagnosed with high blood pressure that her treating physician attributed to her experience at work.

As a final point on the subject of adverse employment actions, Defendant erroneously suggests that the consistent undermining of an employee's authority that leaves an employee no option but to resign against her will somehow fails to constitute an ultimate employment decision.  Needless to say, if this were the law, it would render the *Haley* analysis and, more fundamentally, the very notion of constructive discharge in the context of Title VII discrimination, utterly gutless.  The Courts have consistently interpreted Title VII to provide a remedy wherever unlawful discrimination can be demonstrated, and through such mechanisms as the *McDonnell Douglas* analysis and the *Haley* factors in the 5th Circuit, created avenues for plaintiffs to prove their cases by circumstantial evidence without unduly exposing genuinely innocent employers from unjust and meritless actions.  The record in this case clearly demonstrates that Plaintiff has established a prima facie case that warrants trial by jury.

      **B.**    **Defendant's purported non-discriminatory reasons – Pretextual**

As the Court is aware, the burden shifts back to the Defendant after plaintiff demonstrates a prima facie case. The Defendant is tasked with articulating non-discriminatory reasons for its actions, after which the plaintiff must respond and show that the defendant's proffered reasons were false, and that the real reason for employee's discharge was because she was a member of a protected class.[38]  Since direct evidence of employer's discriminatory intent is rare, plaintiff is allowed to make this showing through circumstantial evidence demonstrating that a defendant's articulated nondiscriminatory rationale was pretextual. [39,40]

---

[38] *See Pegram v. Honeywell, Inc.,* 361 F.3d 272, 281 (5th Cir. 2004) (citing *Estate of Martineau v. ARCO Chem. Co.*, 203 F.3d 904, 912 (5th Cir. 2000)).
[39] *LaPierre v. Benson Nissan, Inc.,* 86 F.3d 444, 449 (5th Cir. 1996).

Here, Defendant Constable's Office's explanations miss the mark, as each fails to genuinely explain the conduct at issue in non-discriminatory, non-damaging terms. First, Defendant's argument that Plaintiff's decisions were being overturned due to noncompliance with the Progressive Discipline Procedure is without merit because, even if Plaintiff did attempt to "double-discipline" a deputy for the same violation, Defendant never adopted the initial, or lesser of Plaintiff's recommended punishments. Thus, in each instance, the net effect of undermining Plaintiff's authority—and demeaning her in front of her charges—remained. Adoption of the lesser proposed punishment would remedy the problem while upholding and enforcing Plaintiff's authority as jail supervisor. Instead, Defendant's agents completely disregard Plaintiff's recommendations and excused her deputies' violations. As the record reflects, this was never the case with Plaintiff's male predecessors, whose disciplinary decisions were consistently honored.

Next, Defendant's contention that Plaintiff's disciplinary decisions were overturned as too severe is likewise unfounded because Plaintiff enjoyed very little, if any, discretion in determining the severity of the punishment to be administered because she was obliged to abide by the Progressive Discipline Procedure. Hence, if punishments were indeed severe, it was not attributable to Plaintiff, but to the procedure Plaintiff was obligated to enforce. So, though Defendant claims that it was building a "culture" of *tolerance* for its deputies, what it was in fact doing was building a culture of *intolerance* for Plaintiff's authority because the constant pardons of deputies' violations – which, again, were never given during Plaintiff's preceding male sergeants' terms – led them to ignore Plaintiff's orders.

---

[40] *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804, 93 S.Ct. 1817, 1825 (1973); *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S. Ct. 1089, 1093 (1981))

Third, Defendant's allegation that liability reasons caused retraction of Plaintiff's decision to place a pregnant employee on light duty lacks credibility because of Defendant's contrary conduct on a prior identical occasion.  In the previous instance, when the very *same* employee was pregnant under a male sergeant who assigned her to the *same* control room as Plaintiff did (where she spent the *entire* nine months of her pregnancy), there were no claimed liability issues that precluded the assignment from being executed.  Again, the reasonable take-away is that Defendant deliberately considered Plaintiff's recommendations and directives to be of much less value to the organization.

Finally, Defendant's statement that Plaintiff's assignment of a vehicle to a lower ranking employee was overturned for alleged business reasons, as it had to be used for "other purposes," is likewise incredible for the same reason.  One of Plaintiff's male predecessor sergeants had undertaken the same course of action in assigning a vehicle to alternate duty during the assigned officer's pregnancy without question.  Further, the record reflects that the vehicle sat unused in the back parking lot, contrary to Defendant's proffered explanation.

## IV      CONCLUSION

The facts asserted by the parties in this matter are clearly open to different interpretations.  In summary, material issues of fact exist.  Accordingly, summary judgment is inappropriate.

Respectfully submitted,

s/ G. Karl Bernard
G. Karl Bernard (#24294) T.A.
G. KARL BERNARD & ASSOCIATES, LLC
1615 Poydras Street, Suite 220
New Orleans, Louisiana  70112
Telephone:     (504) 412-9953
Facsimile:     (504) 412-8088
karl.bernard@karlbernardlaw.com

**Attorneys for Plaintiff, Terrica Williams**

CERTIFICATE OF SERVICE

    I hereby certify that on this 13th day of October, 2016, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record in this proceeding.

                              s/ G. Karl Bernard
                                  G. Karl Bernard